IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

MAY 18 2005

BEVERLY K. JESSIE,

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

      Plaintiff,

v.                          Civil Action No. 2:04CV28
                                  (Judge Robert E. Maxwell)

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("the Commissioner") denying the Plaintiff's claim for

Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act. The

matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Beverly K. Jessie ("Plaintiff") protectively filed for Supplemental Security Income benefits

on October 14, 1997, and filed her SSI application on November 10, 1997, alleging disability since

December 1, 1996, due to depression, anxiety, and panic attacks (R. 55, 56-58, 63). At the

administrative hearing, Plaintiff's counsel requested that Plaintiff's date of alleged onset be amended

to October 14, 1997, the same date as the protective filing date (R. 12, 299-300). The state agency

denied Plaintiff's application initially and on reconsideration (R. 35-38, 42-43). Plaintiff requested

a hearing, which Administrative Law Judge Guy B. Arthur ("ALJ") held on September 22, 1999,

and at which Plaintiff, represented by counsel, David Furrer, Esquire, and James Ryan, Vocational Expert ("VE"), testified (R. 293-316). On June 17, 2000, the ALJ entered a partially favorable decision finding Plaintiff was disabled commencing January 12, 1999, but not prior thereto. The Plaintiff's claim, therefore, was denied from October 14, 1997, the amended date of onset, through January 11, 1999 (R. 24). Subsequent to the ALJ's finding, by notice dated February 25, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 3).

## II. FACTS

Plaintiff was born on April 7, 1954, and was forty-five (45) years old at the time of the administrative hearing (R. 56, 296). She has a twelfth-grade education and has past work experience as a babysitter (R. 296). The VE classified this work as unskilled, medium exertional work (R. 309). In addition to babysitting, Plaintiff also worked in a garment factory and as a day-care provider (R. 69).

On December 5, 1996, Plaintiff was admitted to Sacred Heart Hospital, located in Cumberland, Maryland, with her chief complaint being "dizziness." At the time of hospitalization, Plaintiff was medicating with Zoloft and Tranxene. The differential diagnosis was for anxiety, depression, conversion reaction, and malingering. The final diagnosis on the date of admittance was of major depression and somatization disorder (R. 83-85). During Plaintiff's hospitalization, she was treated with "psychotherapy, milieu therapy and group therapy." She was counseled about panic disorder and panic attacks (R. 86). It was noted at Plaintiff's discharge by Donna Carmosky, M.D., that Plaintiff was "well groomed . . . [and] made good eye contact and was well related" during her hospital stay. She demonstrated "no psychomotor agitation or retardation." Plaintiff's speech was

2

normal in "rate and tone" and her "[t]hought process was goal directed." Plaintiff "denied auditory, visual hallucination, suicidal, homicidal, paranoid ideation" and "[h]er mood was cheerful . . . [a]ffect was broad ranged . . . [j]udgment fair . . . [i]nsight fair." Dr. Carmosky's assessment of Plaintiff was that 1) stressors had developed panic symptoms; 2) she had some somatic complaint; 3) her mood had improved; and 4) the presence of an underlying depression was unclear. Dr. Carmosky diagnosed Axis I: panic disorder with agoraphobia, 300.21; Axis II: deferred; Axis III: nothing acute; Axis IV: financial stressors; and Axis V: 60-65. Dr. Carmosky suggested that Plaintiff follow up at Potomac Highlands Mental Health Guild with her condition, prescribed Klonopin 0.5 mg for one (1) month and recommended a regular diet, activity as tolerated, and no alcohol or caffeine use (R. 87).

On January 8, 1997, Plaintiff did visit Potomac Highlands Guild, where an "Intake Addendum" was completed. Plaintiff stated her chief complaint was panic attacks. Plaintiff stated she occasionally had "not very strong" thoughts about suicide. These thoughts, according to Plaintiff, occurred in November, 1996, because she did not know "what was wrong with her." Plaintiff also stated she had no plans of suicide and "would not because of her children" (R. 129). It was noted during Plaintiff's evaluation that she was not a danger to others. The following behavioral concerns were listed: 1) prior to hospitalization at Sacred Heart Hospital, Plaintiff would not leave the house; 2) Plaintiff experienced "nervousness, chest tightness, hot flashes"; 3) Plaintiff previously tried Prozac, but stated it did not help; 4) Plaintiff did not present with diabetes or hormone condition; and 5) Plaintiff was married, with two children and two grandchildren in her home (R. 130). The evaluation revealed that Plaintiff's level of consciousness was alert, she was appropriately dressed, her speech was normal, her behavior was calm, she maintained fair eye

3

contact, she presented with a cooperative conduct, her psychomotor was calm, her affect was normal, and her mood was neutral (R. 131). The evaluator noted Plaintiff demonstrated difficulty with social situations and scored a seventeen (17) on the Symptom Distress test, which score denoted mild to medium stress. There was no condition or factor identified which affected Plaintiff's mental status. It was noted that Plaintiff's intellectual capacity impression was average, her general fund of knowledge was average, her insight was adequate, and her judgment was unimpaired. The initial diagnostic impression was determined to be as follows: Axis I: 300.21 panic disorder with agoraphobia; Axis II: 700.0 deferred; Axis III: none; Axis IV: recent discharge from Sacred Heart Hospital (psychosocial stressor); and Axis V: GAF, 60 (R. 132).

On January 13, 1997, Plaintiff returned to Potomac Highlands Guild, where a "Social History and Assessment" was completed by Wanda Carr, L.S.W. Plaintiff informed Ms. Carr that her mother had experienced anxiety disorders and had been admitted to a psychiatric hospital and her uncle had committed suicide (R. 123). Plaintiff stated she experienced no difficulty sleeping since she had been taking medication. Plaintiff also recounted she was hospitalized in December 1996 for panic attacks. She stated she was relieved "to find out and receive treatment" for the panic attacks and "[f]eels she is stable on meds" (R. 124). Plaintiff stated her religious faith was "[v]ery important" in that it "[h]elped get her through problem with panic/anxiety." Ms. Carr noted Plaintiff lived with her husband, two daughters, and two grandchildren and would be "glad when daughter finds a place of her own and moves with her baby." Plaintiff, it was noted, intended to adopt one grandchild, because that would make "her feel like life is worth living." Plaintiff's personal interests were noted as swimming, picnicking, reading, and attending church services. Plaintiff stated she has the two following needs: 1) her daughter and grandchild to relocate to a home of their own; and 2) more contact with her older daughter and grandchildren (R. 125).

4

On February 4, 1997, Plaintiff was treated by a physician at Potomac Highland Guild. The physician's notes contained the following: 1) Plaintiff had developed a fear of going away from home; 2) Prozac made her more agitated; 3) Plaintiff's stressors were her rearing her two grandchildren; 4) Plaintiff had no family members who suffered from mental illness or suicide; 5) Plaintiff currently felt "ok"; and 6) Plaintiff did not want counseling. Her affect and mood were observed to be normal, she demonstrated good speech and insight, average intelligence was noted, and her judgment was listed as "ok." The diagnosis was for Axis I: panic disorder with agoraphobia; Axis II: none; Axis III: none; Axis IV: none; and Axis V: 65/75 (R. 120).

On February 27, 1997, Plaintiff was seen by Anthony A. Saweikis, M.D., of Saweikis Family Medicine, located in Keyser, West Virginia. He noted Plaintiff's symptoms to be tension and neck pain, light headedness, and "hot spells." He listed his impressions as "anxiety/panic," "hot flashes," and "itchy ear canals." Plaintiff was urged by Dr. Saweikis to keep her "psych appointment" (R. 155).

On March 4, 1997, Plaintiff returned to Potomac Highland Guild and was evaluated by a physician. Plaintiff stated she experienced "generalized anxiety" due to her "daughter and grandchildren." She was diagnosed with anxiety disorder and panic disorder. Paxil was prescribed (R. 119). Plaintiff cancelled her March 7, 1997, appointment at Potomac Highlands Guild , and on March 14, 1997, Plaintiff failed to appear for her appointment at Potomac Highlands Guild (R. 117-18).

On March 25, 1997, Plaintiff visited Dr. Saweikis and stated her psychologist had doubled the Paxil dosage and she could not sleep; she, therefore, had stopped taking all medications. Dr. Saweikis listed his impression of Plaintiff's condition as anxiety and noted Plaintiff was "better off

Paxil and Klonopin." His plan was for her to "stay off meds" and he would notify her psychologist (R. 154).

Plaintiff was examined on April 17, 1997, by Mohammad Shafiei, M.D., whose practice was located in Cumberland, Maryland. Plaintiff complained of "nearly persistent pain involving her right hand, wrist, elbow, and occasionally her right shoulder and neck." Plaintiff also stated she had been experiencing "some tingling sensation and numbness in her fingers bilaterally." She stated these symptoms had started several months earlier and were caused by no "specific trauma or injury." Plaintiff also informed Dr. Shafiei that she had "recurrent leg pain and pain in her feet for the past 10-15 years." Dr. Shafiei noted Plaintiff had a past medical history, which included anxiety attacks and panic attacks (R. 175). His neurologic findings as to Plaintiff included the following: 1) she was awake, alert, and well oriented; 2) her speech was normal; 3) her memory was intact; 4) all cranial nerves were normal; 5) no motor weakness or atrophy were noted; 6) her muscle tone was normal; 7) she demonstrated normal range of motion; 8) her "DTR'S" were equally active and symmetrical; 9) she had no abnormal involuntary movements; 10) plantar flexor bilaterally; 11) no abnormal pathologic reflexes were observed; 12) her gait was normal; and 13) her cerebellar was intact. Dr. Shafiei noted "subjective paresthesia involving the tip of fingers and toes bilaterally." Plaintiff's cortical modalities were in tact and her sense of position and vibration were normal. Dr. Shafiei performed Motor and Sensory Nerve Conduction Velocity Studies of Plaintiff's upper extremities and those findings were within normal range. Dr. Shafiei diagnosed recurrent pain in Plaintiff's right arm and forearm and panic and anxiety attacks. He ordered an EEG and prescribed Pamelor 10mg and Klonopin 0.5 mg (R. 175-76).

On April 21, 1997, an EEG was performed on Plaintiff at Sacred Heart Hospital. The results

were normal (R. 177). Also on April 21, 1997, Plaintiff returned to Dr. Saweikis and complained of continued panic attacks. She informed Dr. Saweikis that Dr. Shafiei had prescribed Pamelor 10mg and Klonopin 0.5 mg. He diagnosed her with anxiety (R. 153).

On June 19, 1997, Plaintiff was seen by Dr. Shafiei for a follow-up examination post EEG. Dr. Shafiei noted Plaintiff was "extremely nervous and depressed due to the fact that she has recently lost her adopted daughter." Plaintiff stated she was experiencing difficulty sleeping at night and unable to purchase her medications due to her not being issued a "medical card." Even though Plaintiff appeared "apprehensive and tearful," Dr. Shafiei noted "[n]o new neurologic development." Dr. Shafiei provided Plaintiff with samples of Zoloft 50mg, instructed her to continue taking Klonopin 0.5mg, and directed her to return in eight (8) to ten (10) weeks (R. 178).

On October 9, 1997, Plaintiff was seen at the Saweikis Family Medicine practice, at which time it was noted she was "extremely tearful (walk-in) depressed – lost her granddaughter, age 2 ½ in June." Plaintiff denied suicidal ideation but had some "passive thoughts of death." The need for institutional care was not found, but it was noted Plaintiff "should have very close crisis counseling," which was arranged for her. Samples of Zoloft 50mg were provided. She was diagnosed with depression and grief (R. 151).

On December 9, 1997, Plaintiff returned to Potomac Highland Guild and reported she had been grieving and depressed since her granddaughter died in hospital due to a viral infection. She stated she had low energy, was sleeping poorly, and had continued thoughts of her deceased granddaughter. Plaintiff told the physician that she was talking Zoloft, but was halving them to "stretch them" because she could not afford medication. Her affect and mood were noted as decreased. The following diagnosis was noted: 1) Axis I: bereavement, panic controlled; 2) Axis

II: none; 3) Axis III: none; 4) Axis IV: illegible; and 5) Axis V: 55 (R. 115).

On December 23, 1997, a "Psychiatric Review Technique" was completed by Samuel Geats, Ph.D., of Plaintiff (R. 205-13). Dr. Geats noted there was no evidence of organic mental disorders, schizophrenic, paranoid, other psychotic disorders, somatoform disorders, personality disorders, or substance addiction disorders (R. 207, 210, 211). Dr. Geats did find Plaintiff had an affective disorder, namely depression (R. 208). In the "Mental Retardation and Autism" category, Dr. Geats found Plaintiff to demonstrate "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period, as evidenced by at least . . . V [verbal] = 74, P [performance] = 80, FS [full scale] = 76." In the category of "Anxiety Related Disorders," Dr. Geats found "[a]nxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms" (R. 209). In rating the severity of Plaintiff's impairments, Dr. Geats found the following degrees of functional limitations: 1) restrictions of activities of daily living – "none"; 2) difficulties in maintaining social functioning – "slight"; 3) deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work setting or elsewhere) – "often"; and 4) episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors) – "never" (R. 212). Dr. Geats also noted that any anxiety-related disorder was absent "[s]ymptoms resulting in complete inability to function independently outside the area of one's home" (R. 213).

On January 13, 1998, Dr. Saweikis decided to "hold off on Zoloft for now" and scheduled an appointment with Dr. Shafiei (R. 150).

8

On February 9, 1998, an "Adult Mental Profile" was completed by Carol Trainor, M.S., and Harry W. Hood, M.S., of Plaintiff (R. 217-20). Plaintiff stated she experienced "depression, anxiety, panic attacks, forgetfulness, low energy, and arthritic pain. Plaintiff informed the evaluators that she was taking Xanax .25mg and Volteren 50mg, she smoked, and she experienced "pain and problems mainly in her right leg and arm." The evaluators noted Plaintiff had been hospitalized at Sacred Heart Hospital in 1996 because she thought "she was dying." Included in Plaintiff's social history were the following assertions of Plaintiff: 1) she was not abused by her husband, but she did experience marital turmoil; 2) she has a good relationship with her adult children; 3) she intended to adopt a granddaughter, but the child had died; and 4) she felt her depression was "due to feelings of sadness and guilt surrounding the death of that granddaughter (R. 217-18).

Plaintiff stated her activities of daily living included the following: 1) awoke at 11:00 a.m.; 2) drove when necessary; 3) managed her "bills and money"; 4) related to others, especially her daughters and mother; 5) performed household chores, including light cleaning, cooking, shopping; 6) scheduled no daily activities, but watched television, walked, swam and read the Bible; 7) existed mainly in a "vegetative" state, but exhibited no fear of leaving her home; 8) occasionally attended church; 9) took "Xanax to help her sleep"; and 10) retired at about 12:30 a.m. (R. 218, 220).

The examination of Plaintiff revealed her to be well groomed and cooperative. Plaintiff "showed no anger or hostility" and demonstrated interpersonal behavior that was "relatively appropriate." Plaintiff's eye contact was "fair to poor." Plaintiff's speech was deliberate, slow, and in low tones, and her articulation was mildly impaired. She was "oriented X4" and her mood was "downcast." Plaintiff demonstrated blunted affect, organized thought, slow and deliberate thought, no delusional thinking, no hallucinations, no illusions, and fair insight and judgment. Plaintiff

9

displayed "[s]ome transient suicidal thought" and her "[i]mmediate, short-term and remote recall were all below average." Her concentration was limited, abstract thinking was poor, and psychomotor behavior was "moderately retarded." Her posture was normal and her gait was slow (R. 218).

The results of the WAIS-R were as follows: 1) Verbal IQ: 74; 2) Performance IQ: 80; and Full Scale IQ: 76. The evaluators, in assessing the validity of the WAIS-R, noted Plaintiff was "unmotivated" during the testing and her "deficient concentration, deficient long-term memory, depression and anxiety" may have compromised the test's validity. Plaintiff's results of the WRAT-III test were as follows: 1) Reading, 77; 2) Spelling, 81; and 3) Arithmetic, 71. It was noted that Plaintiff "put forth questionable effort," and her achievement testing may have been affected by her "limited concentration, anxiety and depression" (R. 219).

Plaintiff's subjective symptoms were listed as "limited concentration, anxiety with panic attacks, limited range of motion due to arthritis, nervousness, anhedonia, low energy, depressed mood, irritability, low self-esteem, fatigue, psychomotor retardation, memory problems, crying spells, guilt, excessive worrying, vegetativeness, occasional suicidal ideas, and self-isolation." Plaintiff's objective symptoms were noted as "limited concentration, fair to poor eye contact, social dysfunction, vegetativeness, apathy, nervousness, irritability, self-isolation, depression, forgetfulness, deficient memory, fatigue, moderate psychomotor retardation, mildly limited abstract thinking & judgement (sic), & tearfulness" (R. 219).

The evaluators concluded as follows: 1) Axis I: major depressive disorder, recurrent, moderate and panic disorder without agoraphobia; Axis II: borderline intellectual functioning; and Axis III: arthritis, mild obesity. It was determined that Plaintiff could manage her own financial

10

affairs, could likely manage simple job directives with practice, and could likely maintain adequate work relationships (R. 220).

On February 10, 1998, Samuel Geats, Ph.D., completed a mental residual functional capacity assessment of Plaintiff (R. 214-16). Dr. Geats found Plaintiff exhibited no limitations in remembering locations and work-like procedures and understanding and remembering very short and simple instructions, but he found Plaintiff moderately limited in understanding and remembering detailed instructions. Plaintiff was found to have no limitations in carrying out very short and simple instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, working in coordination with or proximity to others without being distracted by them, and making simple work-related decisions. Dr. Geats did find Plaintiff demonstrated moderate limitations in her ability to carry out detailed instructions and sustaining an ordinary routine without special supervision (R. 214).

Dr. Geats found no evidence of limitation as to Plaintiff's ability to sustain concentration and persistence, ask simple questions, accept instructions and respond appropriately, get along with coworkers, or maintain socially appropriate behavior. Plaintiff was found to have no limitations relative to her ability to adapt. He noted moderate limitations in Plaintiff's ability to interact appropriately with the general public (R. 215). Dr. Geats' functional capacity assessment was that Plaintiff had a severe impairment which did not meet or equal a listing and did "not result in substantial reduction in functioning." He opined that Plaintiff retained the "capacity to understand and follow routine, 2 + 3 step work-related activities with initial supportive supervision" (R. 216).

On March 4, 1998, Plaintiff returned to Potomac Highland Guild for evaluation, and her "presenting problems (therapist's observation) [listed as] grief/loss" due to the death of her

granddaughter (R. 111-14). The tool used to evaluate was the "BDI-44" (R. 111). It was noted that Plaintiff had no "history of suicidal/homicidal thoughts or behaviors" (R. 112). Her level of consciousness was listed as lethargic. Plaintiff was appropriately dressed. Her speech was slowed, behavior was calm, eye contact was good, conduct was cooperative, affect was downcast, and mood was depressed. Plaintiff's psychomotor was observed as "crying" (R. 114). The following initial diagnosis was determined: 1) Axis I: major depressive disorder; 2) Axis II: none; 3) Axis III: none; Axis IV: granddaughter's death; Axis V: current GAF was 58. The evaluator noted Plaintiff would benefit from outpatient services and the "opportunity to vent emotions she has held back from family members to spare them" (R. 114).

On March 10, 1998, Plaintiff visited the Potomac Highlands Guild, where another Social History was completed (R. 104-09). Plaintiff statement of problem was she was "[t]rying to deal with the death of her grandchild." She stated she had coping problems, anxiety disorders, was a victim of verbal abuse, and experienced depression (R. 105). According to information provided by Plaintiff, she suffered from arthritis, pain and panic attacks. Plaintiff confirmed she had no physical limitations (R. 106). Plaintiff stated she attended church, experienced conflict with her husband, was unemployed, watched television and listened "to gossips tapes." Plaintiff listed her needs as wishing "her granddaughter would not have died" . . . and wishing "things would be better with her husband" (R. 107). Plaintiff's GAF was listed as 60/55, and she was observed to be anxious and depressed (R. 108).

On March 18, 1998, Plaintiff underwent individual grief counseling at Potomac Highlands Guild (R. 103). On March 31, 1998, Plaintiff returned to Dr. Shafiei. She stated she had "been experiencing severe anxiety associated with occasional shortness of breath and near passing out."

12

Because of her having no insurance, Plaintiff had not obtained Zoloft and Klonopin medications. She reported no new developments in her situation. Dr. Shafiei diagnosed recurrent anxiety and panic attacks. He prescribed Zoloft and Klonopin (R. 173).

Plaintiff again received grief counseling at Potomac Highland Guild on April 8, 1998 (R. 102). On April 22, 1998, Plaintiff was examined by Dr. Saweikis for panic attacks. He observed Plaintiff's "mood and affect seem to be down. She makes good eye contact but her voice seems tired. . . . She has multiple soft tissue trigger point tenderness located in the trapezius muscle regions, anterior thighs, lateral epicondyles, etc., consistent with some fibromyalgia." He diagnosed "panic/anxiety." He suspected "fibromyalgia" and noted Plaintiff's poor conditioning. His treatment plan included a prescription for Darvocet, but he did note the need for watching "narcotics. Must start walking program and activity" (R. 147). Also on April 22, 1998, Plaintiff returned to Potomac Highlands Guild for a session of individual grief counseling (R. 101). On April 29, 1998, Plaintiff visited Dr. Shafiei, at which time she reported she was feeling "a lot better." She presented with "[n]o new neurologic development." He continued her prescriptions for Zoloft and Klonopin and instructed Plaintiff to return in three (3) months (R. 173).

At Plaintiff's July 29, 1998, appointment with Dr. Saweikis he observed Plaintiff to be "still a little down in her mood." Plaintiff denied "suicidal ideation at present."

Plaintiff returned to Dr. Shafiei on August 3, 1998, and reported "occasional crying spells," but that she was feeling better. She informed Dr. Shafiei that Dr. Saweikis had increased her Zoloft to 100mg "a couple of days ago." Dr. Shafiei observed no new developments. He decreased Plaintiff's prescription for Zoloft to 50mg, added Trazodone 50 mg, and continued Klonopin 0.5mg. It was noted that Plaintiff was "planing to see Dr. Rajan, a local psychiatrist." Plaintiff stated she

13

was "afraid to take any medications giving (sic) by him due to her previous experience" (R. 172).

On August 31, 1998, Plaintiff was seen by Dr. Shafiei for a follow-up evaluation and reported she was feeling depressed "due to the fact that she is off of her medical card now." She also reported that "her panic attacks are less severe." No new developments were reported or observed. Dr. Shafiei instructed Plaintiff to continue her current medications and planned for Plaintiff to gradually taper "off Trazodone, Zoloft and Klonopin due to the fact that she cannot afford buying these medications now" (R. 172).

On September 28, 1998, Plaintiff returned to Dr. Shafiei for a follow-up evaluation. She reported she had tried "to go off Zoloft, but experienced a panic attack." Plaintiff stated she was treated at Potomac Valley Hospital Emergency Room, her Zoloft was increased to 100mg, and she felt "better now." Dr. Shafiei provided Plaintiff with office samples of Zoloft 100mg (R. 172). On September 29, 1998, Plaintiff returned to Dr. Saweikis for an examination. She stated she was "doing good."

On October 13, 1998, Dr. Saweikis corresponded to Mary Ann Antonelli, M.D., of the Rheumatology Section, Department of Medicine at West Virginia University, located in Morgantown, West Virginia, concerning Plaintiff being referred to Dr. Antonelli. Dr. Saweikis stated in his correspondence that Plaintiff had "vague complaints of myalgia and arthralgia" and "[h]er symptoms seem consistent with fibromyalgia but a firm diagnosis would be appreciated." Dr. Saweikis informed Dr. Antonelli of Plaintiff's "general depressive symptoms" and "prolonged grieving at the loss of her grandchild." He wrote that Plaintiff's "depression seems to be exacerbating her pain." Dr. Saweikis recounted his course of medicating of Plaintiff and stated,

14

"[r]ather than continue experimenting with medications, I thought it best that you see her to rule out any other treatable causes of her symptoms" (R. 136).

On November 14, 1998, an Intake Addendum of Plaintiff was completed at Potomac Highlands Guild (R. 96-100). Plaintiff's chief complaint was her need for "help getting over her grief about her granddaughter." She stated she felt depressed daily and had not very strong thoughts (occasionally) about suicide "because she misses her grandaughter (sic)" (R. 96). On the mental status examination, Plaintiff was rated as follows: 1) level of consciousness – lethargic; 2) appearance – appropriately dressed; 3) speech – slowed; 4) behavior – subdued; 5) eye contact - good; 6) conduct – cooperative; 7) psychomotor – crying and psychomotor retardation; 8) affect – flat; and 9) mood – depressed (R. 98). It was noted that Plaintiff "appeared to be depressed. After describing why she is coming to PHG she began to cry." Plaintiff's intellectual capacity impression was average, her general fund of knowledge was average, her insight was adequate, and her judgment was unimpaired. The initial diagnostic impression was as follows: 1) Axis I: major depressive disorder, single episode, and bereavement; 2) Axis II: no diagnosis; 3) Axis III: no impression listed; 4) Axis IV: death of granddaughter; and 5) Axis V: Current GAF was 60 (R. 99).

On November 24, 1998, Plaintiff was treated by Dr. Saweikis. She complained of being "still depressed." She was diagnosed with mixed anxiety and depression and fibromyalgia. Dr. Saweikis noted Plaintiff planned to follow-up on the fibromyalgia diagnosis at "WVU 1/99)" (R. 137) On November 25, 1998, Plaintiff received grief counseling at Potomac Highlands Guild (R. 95).

At the administrative hearing, conducted on September 22, 1999, Plaintiff testified that during a panic attack, she felt "tingly," her heart beat fast, she felt "scared," she felt as though she

were going to faint, and she felt as though she were dying. Prior to her using medication, Plaintiff stated she had panic attacks two (2) to three (3) times per week (R. 303). Plaintiff testified she responded well to the medication, Klonopin, which she was taking in combination with Celexa at the time of the administrative hearing. Plaintiff stated that when she takes her medication, she "slightly" feels the panic attacks, "but not as much" (R. 304-06). The ALJ questions Plaintiff about the effects of her medications on her panic attacks. The ALJ stated and asked the following:

> . . . [T]he Klonopin seemed to be working real well. You seemed to be functioning real well. Your activities were up. And . . . [t]hey then switched you off of that and they put you on the Paxil. The Paxil makes you extremely nervous. They bring you off the Paxil. They go ahead and then they put you back on the Klonopin. You're doing well on the Klonopin. They mix in some Zoloft and you're still doing well. When you come off the Klonopin, then apparently the pain or the discomfort increases because they're noting in all sorts of records here – 2/16/99, 5/18/99, 8/3/98, 8/31/98 – that without those medications, apparently things get worse for you. Is that correct? When you're not on the medications things get worse? (R. 305-06).

Plaintiff responded, "Well, like the pain I have gets worse and then the panic attacks will be worse." The ALJ asked the following question: ". . . [O]n a number of occasions you ran out of medications. Or you weren't taking the medications. And the problems that you had with regard to pain or panic attacks came back when you didn't have the medications. Is that right?" The Plaintiff responded, "Yes."

Plaintiff testified at the Administrative Hearing that she her activities of daily living included cooking, cleaning, shopping, doing the laundry, watching television, reading the Bible, attending church, visiting family, and walking (R. 302).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Arthur made the following findings:

1.  The claimant has not engaged in substantial gainful activity since at least 1994.

2.  The medical evidence establishes that the claimant has a history of fibromyalgia and mood disorders, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations No. 4.

3.  Although the claimant experienced periodic chronic mood restrictions and moderate fibromyalgia pain from October 14, 1997, through January 11, 1999, her descriptions of her limitations as a result of those restrictions, to the extent that she was precluded from a range of medium, light, and sedentary exertional activity within named restrictions are not fully credible.

4.  The Administrative Law Judge finds that **for the period prior to January 12, 1999** the claimant retains the residual functional capacity to perform the exertional demands of a range of medium [and alternatively light and sedentary] work, or work which requires maximum lifting of 50 pounds at a time and occasionally lifting and carrying objects weighing up to 25 pounds. Her capabilities were diminished by the following additional limitations: a preclusion as to climbing ladders, ropes and scaffolds, no hazardous heights and no hazardous moving machinery, no work involving extreme temperature changes; the ability to frequently climb stairs and ramps and to balance and stoop, with only occasional kneeling, crouching and crawling; while experiencing moderate pain [with moderate being defined to be at a level of severity that would preclude the attention and concentration required for high stress production oriented work and complex work but not of a level of magnitude or severity to preclude the performance of either unskilled or semi-skilled work of a less stressful nature involving the performance of simpler work instructions] with moderate [as defined] limitations as to attention and concentration, persistence and pace and the ability to handle work stresses.

5.  The claimant was unable to perform the unskilled light to medium exertional requirements of her past relevant work as a garment factory worker, and as a worker at a developmental center for disabled adults, from October 14, 1997, through January 11, 1999, but she did retain the ability to return to her prior work as a babysitter. Alternatively, she could also perform other work identified by the impartial vocational expert.

6.  The claimant had the residual functional capacity to perform a range of medium work and alternatively light and sedentary work within named exertional and nonexertional restrictions from October 14, 1997, through January 11, 1999. (20 CFR 416.967).

7.   The claimant was 42 to 45 years old between October 14, 1997, and January 11, 1999, which is defined as a "younger person" (20 CFR 416.963).

8.   The claimant graduated from high school and she has a high school education as defined by the regulations (20 CFR 416.964).

9.   The claimant has not acquired work skills which are transferable to medium, light, or sedentary exertional occupations.

10.  Based on claimant's residual functional capacity for a limited range of medium, light, or sedentary work, and the claimant's age, educational background, and work experience between October 14, 1997, and January 11, 1999, using Sections 404.1569 and 416.969 and rules 203.28, 202.20, and 201.27, Table 1, Appendix 2, Subpart P, Regulations No. 4, as a framework for decisionmaking, a conclusion of "not disabled" is directed.

11.  Although the claimant was unable to perform the full range of light work between October 14, 1997, and January 11, 1999, there were a significant number of jobs in the national economy which she could perform using the above-cited Rules as a framework for decisionmaking. Dr. Ryan, cited as examples of unskilled medium jobs restaurant worker, 2,800 such jobs in the local region, and 72,000 nation-wide; janitor, 3,800 such jobs in the local region, and 98,000 nationwide; and warehouse worker, 4,200 such jobs in the local region, and 96,000 nationwide. The expert further cited as unskilled light jobs laundry worker, 1,200 such jobs in the local region, and 64,000 nationwide; stock clerk, 2,900 such jobs in the local region, and 79,000 nationwide; and, machine tender, 1,700 such jobs in the local region, and 62,000 nationwide; and as unskilled sedentary jobs general clerical worker, 1,100 such jobs in the local region, and 39,000 nationwide; assembly worker, 1,500 such jobs in the local region, and 58,000 nationwide; and quality control worker, 1,100 such jobs in the local region, and 39,000 nationwide.

12.  Using the above-cited Rules 203.28, 202.20, and 201.27 as a framework for decisionmaking, the claimant was not under a "disability" as defined in the Social Security Act, at any time from October 14, 1997, through January 11, 1999 (20 CFR 416.920(b)).

13.  Using Sections 404.1569 and 416.969 and Rule 202.17, Table 1, Appendix 2, Subpart P, Regulations No. 4, as a framework for decisionmaking on and after January 12, 1999, further direct the conclusion that, considering the claimant's residual functional capacity [and above moderate non-exertional limitations], her age, education, and work experience, she be found "disabled" commencing January 12, 1999.

14. The claimant has been under a "disability," as defined in the Social Security Act, since January 12, 1999, but not prior thereto (20 CFR 416.920(f)) (R. 21-24).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Although Plaintiff, in her brief, fails to list any specific contention or contentions regarding the ALJ's decision, the undersigned has concluded, after a close reading of her brief, that the Plaintiff contends the following:

1. The Commissioner's finding of fact in this case are not supported by the substantial evidence of record (Plaintiff's brief at p. 10);

2.	The decision of the Administrative Law Judge is not borne out by the great weight of the evidence in this matter (Plaintiff's brief at p. 12); and

3.	There is no comment or finding in the Administrative Law Judge's Opinion as to any finding on credibility (Plaintiff's brief at p. 12).

Defendant contends:

1.	Substantial evidence supports the Commissioner's decision that Plaintiff's subjective complaints of disabling symptomatolgy were not supported by the record prior to January 12, 1999; and

2.	The ALJ properly determined that Plaintiff's alleged disabling symptomatolgy prior to January 12, 1999, was not credible.

### C. Substantial Evidence

Plaintiff contends the ALJ's findings of fact in this case are not supported by the substantial evidence of record, but the defendant alleges that substantial evidence supports the ALJ's decision that Plaintiff's subjective complaints of disabling symptomatolgy were not supported by the record prior to January 12, 1999. Plaintiff also asserts the decision of the Administrative Law Judge is not borne out by the great weight of the evidence in this matter

Relative to Plaintiff's alleged disability from October 14, 1997, through January 11, 1999, the ALJ made, in addition to other specific findings, the following findings:

. . .

4.	The Administrative Law Judge finds that **for the period prior to January 12, 1999** the claimant retains the residual functional capacity to perform the exertional demands of a range of medium [and alternatively light and sedentary] work, or work which requires maximum lifting of 50 pounds at a time and occasionally lifting and carrying objects weighing up to 25 pounds. Her capabilities were diminished by the following additional limitations: a preclusion as to climbing ladders, ropes and scaffolds, no hazardous heights and no hazardous moving machinery, no work involving extreme temperature changes; the ability to frequently climb stairs and ramps and to balance and stoop, with only occasional kneeling, crouching and crawling; while experiencing moderate pain [with moderate being defined to be at a level of

severity that would preclude the attention and concentration required for high stress production oriented work and complex work but not of a level of magnitude or severity to preclude the performance of either unskilled or semi-skilled work of a less stressful nature involving the performance of simpler work instructions] with moderate [as defined] limitations as to attention and concentration, persistence and pace and the ability to handle work stresses.

5.    The claimant was unable to perform the unskilled light to medium exertional requirements of her past relevant work as a garment factory worker, and as a worker at a developmental center for disabled adults, from October 14, 1997, through January 11, 1999, but she did retain the ability to return to her prior work as a babysitter. Alternatively, she could also perform other work identified by the impartial vocational expert.

6.    The claimant had the residual functional capacity to perform a range of medium work and alternatively light and sedentary work within named exertional and nonexertional restrictions from October 14, 1997, through January 11, 1999. (20 CFR 416.967).

. . .

10.   Based on claimant's residual functional capacity for a limited range of medium, light, or sedentary work, and the claimant's age, educational background, and work experience between October 14, 1997, and January 11, 1999, using Sections 404.1569 and 416.969 and rules 203.28, 202.20, and 201.27, Table 1, Appendix 2, Subpart P, Regulations No. 4, as a framework for decisionmaking, a conclusion of "not disabled" is directed.

. . .

12.   Using the above-cited Rules 203.28, 202.20, and 201.27 as a framework for decisionmaking, the claimant was not under a "disability" as defined in the Social Security Act, at any time from October 14, 1997, through January 11, 1999 (20 CFR 416.920(b)) (R. 22-23).

The Plaintiff asserts the record provided substantial evidence that Plaintiff suffered from panic attacks, major depression, and bereavement for a period of time. Substantial evidence is the standard of review which calls for "such relevant evidence as a reasonable mind might accept to support a conclusion," *Richardson, id.,* and evidence which "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" *Hays, id.* The undersigned finds

21

substantial evidence exists in the record and was adequately evaluated and considered by the ALJ to support his finding that Plaintiff was not disabled from October 14, 1997, through January 11, 1999.

The ALJ considered the evidence provided by Sacred Heart Hospital as to Plaintiff's care from December 5 to December 9, 1996. He discussed Plaintiff's symptoms, her treatment, her diagnosis of panic disorder with agoraphobia, and her release when she was stable (R. 13). The record from Sacred Heart Hospital further revealed that Plaintiff was well groomed, made good eye contact, and was well related. She presented with no psychomotor agitation or retardation and her thought process was goal directed. The record further revealed that Plaintiff's mood was cheerful, her affect was broad ranged, and her judgment and insight were fair. The physician who evaluated Plaintiff found her panic symptoms had been triggered by stressors, her mood had improved during her hospital stay, and the cause of underlying depression was unclear. The doctor suggested Plaintiff seek mental health counseling, prescribed Klonopin, and recommended Plaintiff adhere to a regular diet and continue with her activities as she could tolerate them (R. 87). The record of evidence from Sacred Heart Hospital, as considered by the ALJ, contained substantial evidence that Plaintiff was functioning and could continue to function, despite her experiencing stressor-induced panic attacks.

The ALJ also discussed the evidence from Potomac Highlands Guild, which detailed Plaintiff's mental health counseling for depression and grief following the death of her granddaughter (R. 13). Plaintiff experienced low energy, poor sleep, decreased affect and mood, and was diagnosed with bereavement (R. 111, 115). On March 14, 1998, Plaintiff was diagnosed with major depressive disorder due to her granddaughter's death (R. 114). The records at Potomac Highlands Guild revealed that Plaintiff's panic attacks were controlled (R. 115). This evidence

outlines that Plaintiff was suffering from depression, grief, and bereavement from December 1997 to March 1998, but the record also confirms that Plaintiff's condition was episodic because of the death of her granddaughter, not recurrent (R. 101-103, 104-109).

The ALJ reviewed and evaluated the evidence of record provided by Dr. Saweikis, who treated Plaintiff for ". . . depressive symptoms after the death of her granddaughter," medicated her with Zoloft, Klonopin and Ultram, and diagnosed her with "mixed anxiety depression" (R. 14). Dr. Saweikis pronounced diagnoses based exclusively on Plaintiff's statements. Throughout his treatment of her during the period of time in question, Dr. Saweikis refers to her mental health condition as "anxiety/panic" (R. 155); "anxiety" (R. 154); depression and grief (R. 151); depression and anxiety (R. 150); "panic/anxiety" (R. 147); and mixed anxiety and depression (R. 137). As revealed in the record, Plaintiff was treated by Dr. Saweikis primarily for "multiple vague complaints of myalgia and arthralgia" (R. 14). In an October 1998 letter to a consultative physician for those conditions, Dr. Saweikis refers to Plaintiff's mental health as "general depressive symptoms" (R. 136). Further, there is no definitive test was administered by Dr. Saweikis to determine Plaintiff's mental condition and its effect on Plaintiff's ability to function. The undersigned, therefore, finds there is no substantial evidence relative to Dr. Saweikis to contradict the finding of the ALJ that Plaintiff was not disabled from October 1997 to January 1999.

Dr. Shafiei, a neurologist, did conduct a neurological examination of Plaintiff and these results were addressed by the ALJ. The ALJ noted Plaintiff, during the April 17, 1997 exam, "disclosed intact memory, sensory, reflex and motor responses" This is substantial evidence that Plaintiff was not impaired (R. 14). The evidence also contained the opinion of Dr. Shafiei as to Plaintiff's mental health in June, 1997, after the death of her granddaughter. He observed '[n]o

neurologic development," instructed Plaintiff to continue the prescribed Klonopin, and he prescribed Zoloft (R. 178). In March, 1998, Plaintiff returned to Dr. Shafiei with complaints of severe anxiety. It was noted Plaintiff had not been medicating with Zoloft and Klonopin as prescribed (R. 173). In April, 1998, however, after resuming her medication therapy, Plaintiff reported to Dr. Shafiei that she was feeling "a lot better" (R. 173). Again, in August, 1998, Plaintiff reported that, in spite of experiencing "occasional crying spells," she was feeling better. Later that same month, Plaintiff informed Dr. Shafiei that, even though her panic attacks were less severe, she was feeling depressed because she had not been taking her medication. On September 28, 1998, Plaintiff informed the doctor that she had experienced a panic attack because she was not taking Zoloft but that she was feeling better because she had resumed treatment with Zoloft (R. 172). There is substantial evidence that Plaintiff's periodic depression and periodic panic attacks were successfully treated with medication and became problematic only when Plaintiff did not medicate her conditions as prescribed. The ALJ noted Plaintiff "said that in November 1997 she was doing fine on the medication Klonopin, then she was taken off it for an unknown reason and put on Paxil but she could not eat or sleep so she was taken off Paxil. More recently she took a combination of Zoloft and Klonopin which helped..." (R. 16). The undersigned, therefore, finds the ALJ's decision that, "for the period prior to January 12, 1999 . . . the claimant has . . . periodic panic attacks treated with Klonopin, and, periodic depression treated with Zoloft," and is not disabled, is supported by substantial evidence (R. 18)

Additionally, the ALJ reviewed and considered the February 9, 1998, consultative psychological evaluation conducted by Harry W. Hood, M.S., which found Plaintiff had "deficient concentration, (concentration was described as extremely limited, as evidenced by the claimant's

marked slowness in performing serial 3's, and, her pace was obviously slowed as well) with depression and anxiety noted." Plaintiff's IQ was as follows: 1)Verbal Scale IQ, 74; 2) Performance Scale IQ, 80; and Full Scale IQ, 76. The ALJ also noted these findings were questionable because it was found Plaintiff demonstrated "slowed efforts and responses" (R. 14). The evidence of record also reveals that the results of this evaluation was qualified by the evaluators as follows: 1) Plaintiff "put forth questionable effort," and 2) Plaintiff was "unmotivated" during the testing (R. 219). Additionally, it was revealed in the evaluation that Plaintiff could manage her own financial affairs, could manage simple job directives with practice, and could maintain adequate work relationships (R. 220). The diagnosis of "major depressive disorder, recurrent, moderate; panic disorder; and borderline intellectual functioning" was also discussed by the ALJ (R. 14). The ALJ expounded on this evaluation by noting that "Mr. Wood's (sic) comments were qualified and only moderate depression was noted . . . ." In spite of the diagnosis, as discussed by the ALJ, Plaintiff could, according to the evaluation, "engage in cleaning, cooking, and shopping, she watched television, she read the Bible, and she visited family." The ALJ noted these activities demonstrated Plaintiff's "ability to focus and concentrate for task completion purposes" (R. 19). Plaintiff asserts that the ALJ failed to follow the mandate in *Higginbotham v. Califano*, 617 F.2d 1058-1060 (4th Cir. 1980), in that he relied on Plaintiff's ability "to do chores" in establishing "that she can engage in any substantial gainful activity . . ." (Plaintiff's brief at p. 12). Although the ALJ did note that Plaintiff's ability to do chores did demonstrate she could "focus and concentrate," the ALJ did not rely exclusively on this conclusion in formulating his decision that Plaintiff was not disabled. As noted above, the ALJ relied on the substantial evidence gleaned from the records of Sacred Heart Hospital, Potomac Highlands Guild, and Drs. Saweikis and Shafiei, and the entire report of Mr. Hood, in

25

which he opined that Plaintiff could likely manage simple job directives with practice and could likely maintain adequate work relationships (R. 220). The undersigned finds, therefore, that substantial evidence existed in the record to support the decision of the ALJ that Plaintiff could perform job duties with "moderate limitations as to attention and concentration, persistence and pace and the ability to handle work stresses" (R. 22).

Plaintiff also contends that the decision of the ALJ "is not borne out by the great weight of the evidence in this matter" (Plaintiff's brief at p. 12). The undersigned notes that the standard of review as to the validity of an ALJ's decision is whether that decision is supported by substantial evidence, not great weight. As noted above, the decision of the ALJ has been reviewed according to the substantial evidence standard.

Based on the above evaluation, the undersigned finds substantial evidence exists to support the findings of fact of the ALJ, and, specifically, the finding Plaintiff could perform work with moderate . . . limitations as to attention and concentration, persistence and pace and the ability to handle work stresses, had the residual functional capacity to perform a range of medium work and alternatively light and sedentary work . . . from October 14, 1997, through January 11, 1999, and that was not under a disability as defined in the Social Security Act, at any time from October 14, 1997, through January 11, 1999.

### D. Credibility

Plaintiff contends there is no comment or finding in the Administrative Law Judge's Opinion as to any finding of credibility, but Defendant contends the ALJ properly determined that Plaintiff's alleged disabling symptomatolgy prior to January 12, 1999, was not credible.

In his decision, the ALJ directly evaluates the credibility of Plaintiff. He states the following:

Thus, based on a consideration of the entire evidence of record, the Administrative law Judge finds that for the period prior to January 12, 1999 that the claimant has moderate fibromyalgia pain, periodic panic attacks treated with Klonopin, and, periodic depression treated with Zoloft. However, the undersigned also finds that the claimant's statements concerning her impairments and their impact on her ability to work were not entirely credible in light of the claimant's own description of her activities and life style, discrepancies between the claimant's assertions and information contained in the documentary reports of activities of daily living as noted above, the reports of the treating and examining practitioners, the medical history, and the findings made on a psychological consultative examination (Exhibit 14F). The medical evidence of record when one reviews all the exhibits of record [e.g. 1F through 15F] is not sufficient to warrant a finding of disability onset prior to January 12, 1999. Consequently, the Administrative Law Judge concludes that although these are impairments that might reasonably be expected to produce the type of pain, depression and other symptom related limitations the claimant alleges, her complaints suggest a greater level of severity than can be shown by the objective medical evidence along (Craig v. Secretary, 76 F.3d, 587 (4th Cir. 1996) (R. 17-18).

This finding is a sufficient analysis of Plaintiff's credibility. It conforms with SSR 96-79,

which mandates the following:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

> 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms

must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The ALJ did make a finding that Plaintiff had "impairments that might reasonably be expected to produce the type of pain, depression and other symptom related limitations the claimant alleges," which is required in Step Two of the Ruling. Once the ALJ made this finding, he then followed the procedure outlined in Step Four. The ALJ considered the following: 1) objective medical evidence in the form of the "reports of the treating and examining practitioners" (R. 14, 18); 2) the individual's own statements about symptoms in the form of Plaintiff's "own description of her

activities and life style, discrepancies between the claimant's assertions and information contained in the documentary reports of activities of daily living as noted above" (R. 15-18); 3) statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual in the form of Plaintiff's "medical history and the findings made on a psychological consultative examination" (R. 13-14, 18-19); and 4) any other relevant evidence in the case records in the form of the "all the exhibits of record [e.g. 1F through 15F] [which] is not sufficient to warrant a finding of disability onset prior to January 12, 1999" (R. 13-18). Although the ALJ found the evidence of record did not support a finding of disability, he, in evaluating Plaintiff's credibility, did not disregard her statements about intensity and persistence of her symptoms because of the absence of substantiated objective medical evidence. The ALJ, as noted in his credibility analysis, reviewed all the evidence of record and compared Plaintiff's statements made at the administrative hearing to that medical evidence of record (R. 15-18).

In his decision, the ALJ complied with Step Five of the Ruling in that his discussion of Plaintiff's credibility contained specific reasons for the finding on credibility and was supported by the evidence in the case record. The ALJ found as follows: 1) "With regard to depression and panic attacks, the claimant has a long history of depression and nervousness, and periodic panic attacks moderated with medication that have apparently gotten worse after January 12, 1999"; and 2) "In reviewing the above evidence of record, the Administrative Law Judge notes that despite having complaints of inability to engage in work activity because of mental . . . disorders, the claimant continued to engage in activities of daily living into late 1998. . ." (R. 17). Further, the ALJ's finding was "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight" he gave to Plaintiff's statements and "the reasons for that weight." The ALJ found

29

Plaintiff was "not entirely credible" and that Plaintiff's "statements are only credible to the extent

of the residual functional capacity as determined and set forth in the narrative and the Findings" (R.

18-19). The ALJ made abundantly clear his reasons for finding Plaintiff was "not entirely credible."

He discussed Plaintiff's testimony about her activities of daily living, the discrepancies in Plaintiff's

assertions about her condition and the her testimony about her activities of daily living, the reports

of treating and examining physicians, and the results of a psychological consultative examination

(R. 18). Finally, The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the

demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these

questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.

1984)(*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va. 176)).

The undersigned, therefore, finds the ALJ did not fail to make a "comment or finding in [his]

Opinion as to any finding on credibility," as alleged by Plaintiff, and that, further, the credibility

analysis conducted by the ALJ sufficiently complies with the mandates established in SSR 96-79.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's

application for Supplemental Security Income is supported by substantial evidence, and I accordingly

recommend that the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's

Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the

Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation

for Disposition, file with the Clerk of the Court written objections identifying the portions of the

Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the

basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _18_ day of May, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE